## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRANCH BANKING AND TRUST COMPANY,** | : | **CIVIL ACTION NO. 1:16-CV-712** |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANGINO LAW FIRM, P.C.,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

| | | |
|---|---|---|
| **BRANCH BANKING AND TRUST COMPANY,** | : | **CIVIL ACTION NO. 1:16-CV-713** |
| | : | |
| | : | **(Chief Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ANGINO LAW FIRM, P.C.,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Branch Banking and Trust Company ("BB&T") commenced separate breach of contract actions against defendants Angino Law Firm, P.C. ("Angino Law Firm"), King Drive Corp. ("King Drive"), A La Carte Enterprises, Inc. ("A La Carte"), Blue Mountain Golf Club, Inc. ("Blue Mountain"), Richard C. Angino, and Alice K. Angino (collectively, "defendants"). Presently before the court for judgment are the complaints against defendants for breach of contract in each of the above-captioned actions. Pursuant to Federal Rule of Civil Procedure 52(a), the court's findings of fact and conclusions of law are set forth below.

## I.  **Findings of Fact**[1]

BB&T is the successor in interest to Susquehanna Bank, and Susquehanna Bank is the successor in interest to Graystone Bank.  (712 Joint Stip. ¶ 3; 713 Joint Stip. ¶ 3).  We will refer to these banks collectively as "BB&T."  BB&T and the defendants have entered into numerous loan agreements since 2007.  The agreements relevant *sub judice* are discussed *infra*.

### A.  **Line of Credit Note**

On February 15, 2007, Angino Law Firm[2] entered into an agreement (the "line of credit note") with BB&T for a line of credit in the amount of $1,000,000.  (713 Joint Stip. ¶ 9; see also 713 J-A).  Angino Law Firm agreed, *inter alia*, to make monthly interest payments on the loan and to pay the loan "in full immediately upon [BB&T]'s demand."  (713 J-A at 1).

Pursuant to the terms of the line of credit note, BB&T could assess fees for late payments on principal and interest.  (See id.)  Specifically, BB&T could charge the greater of 10% of the "regularly scheduled payment" or $250 if any "regularly scheduled interest payment is 20 days or more late."  (Id.)  BB&T could also charge the greater of 10% of the "sum of the unpaid principal plus accrued unpaid interest" or $250 if the loan is not paid in full within 20 days after a demand of

---

[1] Citations to the record include the transcript of trial convened on June 19, 2018 (Trial Tr.), BB&T's exhibits ("P-"), the parties' joint exhibits in No. 1:16-CV-712 ("712 J-"), the parties' joint exhibits in No. 1:16-CV-713 ("713 J-"), the parties' joint stipulation of facts in No. 1:16-CV-712 ("712 Joint Stip."), and the parties' joint stipulation of facts in No. 1:16-CV-713 ("713 Joint Stip.").  Docket entries in the respective cases will be cited as ("712 Doc. __") and ("713 Doc. __") respectively.

[2] Angino Law Firm was formally known as Angino & Lutz, P.C., which was formally known as Angino & Rovner, P.C.  (712 Joint Stip. ¶ 4; 713 Joint Stip. ¶ 4).

payment by BB&T. (Id.) The terms of the line of credit note also entitled BB&T to attorneys' fees and expenses as follows:

> [BB&T] may hire or pay someone else to help collect this Note if [Angino Law Firm] does not pay. [Angino Law Firm] will pay [BB&T] that amount. This includes, subject to any limits under applicable law, [BB&T]'s attorneys' fees and [BB&T]'s legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, [Angino Law Firm] also will pay any court costs, in addition to all other sums provided by law.

(Id.)

In February 2007, Richard and Alice Angino (collectively, "the Anginos") executed a commercial security agreement with Angino Law Firm and BB&T, wherein they agreed to act as unconditional sureties for the payment of the indebtedness under the line of credit note. (713 Joint Stip. ¶ 13; see also 713 J-E). Pursuant to the security agreement, Angino Law Firm agreed to pay BB&T's attorneys' fees and expenses as follows:

> [Angino Law Firm] agrees to pay upon demand all of [BB&T]'s costs and expenses, including [BB&T]'s attorneys' fees and [BB&T]'s legal expenses, incurred in connection with the enforcement of this Agreement. [BB&T] may hire or pay someone to help enforce this Agreement, and [Angino Law Firm] shall pay the costs and expenses of such enforcement. Costs and expenses include [BB&T]'s attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. [Angino Law Firm] also shall pay all court costs and such additional fees as may be directed by the court.

(713 J-E at 5).

In February 2009, King Drive, A La Carte, and Blue Mountain (collectively, "the corporate defendants") executed separate commercial guaranties, wherein they agreed to guarantee the payment of the indebtedness. (713 Joint Stip. ¶¶ 10-12; see also 713 J-B to -D). Pursuant to each commercial guaranty, the corporate defendants agreed, as guarantors, to pay BB&T's attorneys' fees and expenses as follows:

> Guarantor agrees to pay upon demand all of [BB&T]'s costs and expenses, including [BB&T]'s reasonable attorneys' fees and [BB&T]'s legal expenses, incurred in connection with the enforcement of this Guaranty. [BB&T] may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include [BB&T]'s reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

(713 J-B at 3; 713 J-C at 3; 713 J-D at 3).

BB&T and Angino Law Firm modified the line of credit note several times from January 2009 through February 2013. (713 Joint Stip. ¶ 14; see also 713 J-F). However, the terms of the original line of credit note remained "unchanged and in full force and effect" unless expressly agreed by the parties. (See 713 J-F). On January 31, 2013 and February 22, 2013, the Anginos and the corporate defendants executed consent and reaffirmation agreements, wherein they consented to the

modifications of the line of credit note and reaffirmed their liability for the indebtedness. (713 Joint Stip. ¶ 15; see also 713 J-G).

**B.  Term Loan Note**

On February 22, 2011, Angino Law Firm entered into an agreement (the "term loan note") with BB&T for a loan in the amount of $400,000. (712 Joint Stip. ¶ 9; see also 712 J-A). Angino Law Firm agreed, *inter alia*, to make monthly payments towards principal and interest and to pay the loan in full on the loan's maturity date of February 28, 2015. (712 J-A ¶¶ 4(a)-(b)).

Pursuant to the terms of the term loan note, BB&T could collect late charges if Angino Law Firm failed to pay an amount due under the agreement within 10 or more days. (Id. ¶ 5). Specifically, BB&T could charge the greater of 5% of the "unpaid amount" or $50. (Id.) The term loan note also entitled BB&T to attorneys' fees and expenses as follows:

> [Angino Law Firm] will reimburse [BB&T] on demand for all attorneys' fees (which may include, without limitation, the allocable cost of [BB&T]'s internal legal counsel), costs and expenses incurred by [BB&T] in connection with the preparation of the Loan Documents, closing the transaction described in the Loan Documents, and enforcing [BB&T]'s rights with respect to the Loan Documents or any collateral that is security for this Note. Notwithstanding the attorneys' commission provided for in Section 21, which is included therein for the purpose of obtaining judgment in a definite amount, the amount of attorneys' fees that [BB&T] may recover from or on account of [Angino Law Firm] will be the actual amount of attorneys' fees incurred by [BB&T], whether such amount is less or greater than the amount of the attorneys' commission.

(Id. ¶ 6).

In February 2013, the Anginos and King Drive executed separate guaranty and suretyship agreements with BB&T, wherein they agreed to act as unconditional sureties for the payment of the term loan note. (712 Joint Stip. ¶¶ 10-11; see also 712 J-B; 712 J-C). Pursuant to the suretyship agreement, the Anginos and King Drive, as guarantors, agreed to pay BB&T's attorneys' fees and expenses as follows:

> Guarantor shall pay upon demand all costs and expenses incurred by [BB&T] in connection with [BB&T] interpreting, enforcing, protecting and/or preserving its rights or remedies hereunder and any amount thereof not paid promptly following demand therefore shall be added to the sum payable hereunder and shall bear interest at the Default Rate from the date of such demand until paid in full. If [BB&T] employs counsel to enforce this Agreement by suit or otherwise, Guarantor will reimburse Lender upon demand for all costs of suit and other expenses in connection therewith, whether or not suit is actually instituted, together with [BB&T]'s attorney's fees together with interest on any judgment obtained by [BB&T] at such Default Rate, including interest at such Default Rate from and after the date of execution, judicial or foreclosure sale until actual payment is made to [BB&T] of the full amount due [BB&T] hereunder.

(712 J-B ¶ 3; 712 J-C ¶ 3). A La Carte and Blue Mountain also executed separate commercial guaranties, wherein they agreed, *inter alia*, to guarantee "full and punctual payment" of the term loan note. (712 Joint Stip. ¶¶ 12-13; see also 712 J-D; 712 J-E). Pursuant to each commercial guaranty, A La Carte and Blue Mountain agreed, as guarantors, to pay BB&T's attorneys' fees and expenses as follows:

> Guarantor agrees to pay upon demand all of [BB&T]'s costs and expenses, including [BB&T]'s reasonable attorneys' fees and [BB&T]'s legal expenses, incurred in connection with the enforcement of this Guaranty. [BB&T] may hire or pay someone else to help enforce this

> Guaranty, and Guarantor shall pay the costs and
> expenses of such enforcement.  Costs and expenses
> include [BB&T]'s reasonable attorneys' fees and legal
> expenses whether or not there is a lawsuit, including
> reasonable attorneys' fees and legal expenses for
> bankruptcy proceedings (including efforts to modify or
> vacate any automatic stay or injunction), appeals, and any
> anticipated post-judgment collection services.  Guarantor
> also shall pay all court costs and such additional fees as
> may be directed by the court.

(712 J-D at 3; 712 J-E at 3).  A La Carte and Blue Mountain also agreed that their respective commercial guaranties, and any related documents, constituted "the entire understanding and agreement" between themselves, BB&T, and Angino Law Firm and that their agreements could not be altered or amended absent a writing signed by all parties.  (See 712 J-D at 2; 712 J-E at 2).

On March 18, 2015, BB&T and Angino Law Firm executed a term loan modification agreement that extended the maturity date of the term loan note from February 28, 2015 until February 28, 2016.  (712 Joint Stip. ¶ 14; see also 712 J-F ¶ 2). The terms of the original term loan note remained "in full force and effect" unless "expressly modified and amended" by the term loan modification agreement.  (712 J-F ¶ 6).  The Anginos and King Drive executed a consent and reaffirmation agreement, wherein they consented to the term loan note modification and reaffirmed their liability for the indebtedness.  (712 Joint Stip. ¶ 15; see also 712 J-G).

## C.    Forbearance Agreement & Default

On January 2, 2014, BB&T and defendants entered into a forbearance agreement.  (712 Joint Stip. ¶ 17; 713 Joint Stip. ¶ 17; see also 712 J-H; 713 J-H).

BB&T agreed to temporarily increase the amount available under the line of credit note by $100,000 and to forbear from proceeding against the defendants and their property as a result of their default. (See 712 J-H ¶¶ R-4, 2; 713 J-H ¶¶ R-4, 2). The parties also agreed that the forbearance agreement and any agreements referred to therein constituted "the entire agreement" between them and that the forbearance agreement could not be modified or amended absent a writing signed by all parties. (712 J-H ¶ 19; 713 J-H ¶ 19).

Pursuant to the forbearance agreement, the defendants, as obligors, agreed to pay BB&T's attorneys' fees and expenses as follows:

> The Obligors will pay or reimburse [BB&T] for any attorneys' fees and expenses, and/or any other fees and expenses, incurred or paid by [BB&T] for or in connection with the preparation, negotiation and/or implementation of this Agreement and/or that are otherwise related to the Obligations, the Loan Documents and/or this Agreement immediately after demand therefor. The Obligors will pay or reimburse [BB&T] for any additional attorneys' fees and expenses, and/or any other additional fees and expenses, that are incurred or paid by [BB&T] on and after the date of this Agreement for the implementation of this Agreement and/or that are otherwise related to the Obligations, the Loan Documents and/or this Agreement immediately after demand therefor or with payment in full of the Obligations if not sooner demanded.

(712 J-H ¶ 1(a); 713 J-H ¶ 1(a)). The defendants also agreed to "cooperate with [BB&T] in obtaining any appraisal(s)" and to "pay or reimburse [BB&T] for any charge for any such appraisal(s)." (712 J-H ¶ 5(c); 713 J-H ¶ 5(c)). Unless "expressly modified or amended" by the forbearance agreement, "[a]ll provisions of the Loan Documents remain[ed] in full force and effect." (712 J-H ¶ 3(a); 713 J-H ¶ 3(a)).

BB&T called the line of credit note on February 28, 2016. (713 Joint Stip. ¶ 18). Angino Law Firm failed to pay the principal and interest due and thus defaulted. (Id. ¶¶ 18-20). The Anginos and the corporate defendants also failed to pay the principal and interest due under the line of credit note and subsequently defaulted under their respective suretyship agreements. (Id. ¶ 21). BB&T has not received any payments toward the line of credit note since it called the note in February 2016. (Trial Tr. 54:9-11). As of June 15, 2018, defendants owe $657,741— $600,000 in principal and $57,741 in interest—on the line of credit note.[3] (713 Joint Stip. ¶ 20).

The term loan note matured on February 28, 2016. (712 Joint Stip. ¶ 18). As with the line of credit note, Angino Law Firm failed to pay the principal and interest due under the term loan note and defaulted. (See id. ¶ 19). The Anginos and the corporate defendants also failed to pay the amount owed under the term loan note and subsequently defaulted under their respective suretyship agreements. (See id. ¶ 21). Defendants have made some payments towards the term loan note after the sale of certain collateral. (Trial Tr. 54:11-13). As of June 15, 2018, defendants owe

---

[3] We observe that the total amount of interest will have increased in light of the fact that interest on this loan accrues "at the per diem rate of $100." (713 Joint Stip. ¶ 20). We further observe that the total amount owed may soon decrease as a result of the closing date scheduled for the sale of certain real property. (See 713 Doc. 64).

$13,448.87—$9,174.41 in principal and $4,274.46 in interest—on the term loan note.[4] (712 Joint Stip. ¶ 20).

### D. Costs Incurred by BB&T

BB&T seeks late charges, appraisal fees, and attorneys' fees and costs. Although BB&T waived some of these charges in the past, the costs being sought by BB&T as damages *sub judice* have not been waived. (See Trial Tr. 32:19-33:9, 35:4-36:9, 58:23-59:21, 61:3-21, 62:24-63:8, 101:16-20).

#### 1. *Late Charges*

BB&T has incurred $6,274.91 in late charges related to the line of credit note, and $2,886.65 in late charges related to the term loan note. (See P-I; see also Trial Tr. 57:5-58:16). BB&T notified defendants that they owed late charges, but defendants failed to pay. (See Trial Tr. 37:8-14, 57:8-58:21).

#### 2. *Appraisal Fees*

BB&T has incurred $14,000 in appraisal fees related to the line of credit note and the term loan note. (See P-K; see also Trial Tr. 56:5-57:1). From December 2014 through July 2015, BB&T spent $12,800 to have property located on Fishing Creek Valley Road, Harrisburg, Pennsylvania appraised twice, and $1,200 to have Lots 14, 15, 17, 18 in High Point Circle, Harrisburg, Pennsylvania appraised once. (See P-K). These properties are collateral for the line of credit note and the term loan note. (See Trial Tr. 52:17-24, 54:24-55:7, 56:15-24, 95:8-13). BB&T requested

---

[4] We observe that the total amount of interest will have increased in light of the fact that interest on this loan accrues "at the per diem rate of $1.53." (713 Joint Stip. ¶ 20). We further observe that this loan may soon be satisfied in full as a result of the closing date scheduled for the sale of certain real property. (See 712 Doc. 65).

reimbursement for the appraisal fees but defendants did not pay. (See id. at 37:8-18, 59:16-21, 76:12-22).[5]

BB&T ordered the appraisals to comply with the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") as well as regulations promulgated by the Federal Deposition Insurance Corporation ("FDIC"). (See id. at 51:20-52:16, 55:18-56:3, 56:5-13). Specifically, banks are required by the FIRREA and the FDIC to maintain current—that is, 12 months or less—valuation records of collateral on substandard loans. (Id. at 51:25-52:5, 54:14-23, 76:9-11). BB&T classified the line of credit note and the term loan note as substandard loans because there were inherent weaknesses in the loans. (Id. at 49:18-50:14, 66:4-11). BB&T eventually put both loans on "nonaccrual status" as a result of issues with payment, collateral, and cash flow. (Id. at 51:3-13).

### 3. *Attorneys' Fees and Costs*

BB&T has incurred $163,865.30 in attorneys' fees and $5,431.94 in costs. (See P-K; see also Trial Tr. 6:25-7:9; 712 Doc. 66 at 7 n.1; 713 Doc. 65 at 7 n.1). BB&T is represented by the law firm of McNees Wallace & Nurick LLC ("McNees"). (See Trial Tr. 6:4-24). McNees charges BB&T a reduced hourly rate because they are an "institutional client." (Id. at 7:14-20, 14:6-16:4). BB&T's legal team at McNees billed

---

[5] To the extent Richard Angino's account of what bills he received conflicts with testimony given by BB&T's witnesses Attorney Clayton Davidson and Raymond Granger, (compare Trial Tr. 108:9-15, with id. at 37:8-18, 59:16-21, 76:12-22), the court credits BB&T's witnesses. The court finds BB&T's witnesses to be credible and consistent in their testimony. *Per contra*, the court finds Richard Angino's testimony to be incredible. (See, e.g., id. at 104:9-19, 117:9-118:6).

a total of 555.50 hours from January 2013 through June 2018.[6] (See generally P-K; see also 712 Doc. 66 at 7 n.1; 713 Doc. 65 at 7 n.1).

Specifically, the legal team billed as follows:

- Attorney Geoffrey Shuff
    - Time:    123.80 hours
    - Rate:    $300.00
- Attorney Clayton Davidson
    - Time:    290.10 hours
    - Rate:    $306.00-$330.00
- Attorney Debra Fourlas
    - Time:    47.40 hours
    - Rate:    $320.00
- Attorney James DeAngelo
    - Time:    1.30
    - Rate:    $364.50
- Paralegal Mary Kathryn Waters
    - Time:    5.50 hours
    - Rate:    $150.00-$160.00
- Paralegal Dawn Harlacher
    - Time:    14.80 hours
    - Rate:    $170.00
- Paralegal Catherine Wright
    - Time:    1.30 hours
    - Rate:    $190.00
- Paralegal Josephine Brinley
    - Time:    5.40 hours
    - Rate:    $195.00
- Paralegal Theresa Snyder
    - Time:    6.20 hours
    - Rate:    $229.50-$240.00

---

[6] We note that although BB&T's overall summary states that its legal team at McNees billed a total of 642.20 hours, BB&T concedes that it incorrectly added 0.70 hours to Attorney James DeAngelo's total hours. (712 Doc. 66 at 7 n.1; 713 Doc. 65 at 7 n.1). We further note that an independent review of the timekeeper summaries reveals that Litigation Support Manager Lori Ham billed a total of 59.70 hours rather than 145.70 hours as listed in the overall summary. (See P-K). Accordingly, BB&T's overall summary should read that BB&T's legal team at McNees billed a total of 555.50 hours.

- Litigation Support Manager Lori Ham ("Ham")
  - Time: 59.70 hours
  - Rate: $216.00-$220.00

(See generally P-K; see also Trial Tr. 9:15-10:24, 18:17-25). The legal team spent over 200 hours on discovery, depositions, case development, and strategy. (P-K). BB&T produced "over fifteen hundred documents and fifteen thousand pages of discovery" at defendants' request. (Trial Tr. 13:1-16). Ham oversees electronic discovery matters at McNees and coordinates with their outside vendor to ensure the documents are accessible for attorneys. (See id. at 13:17-5). McNees incurred costs of $5,431.94. (See generally P-K; see also Trial Tr. 6:25-7:9).

## II. <u>Conclusions of Law</u>

To establish a claim for breach of contract under Pennsylvania law, the plaintiff must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). In the matters *sub judice*, the parties dispute only the third element, that is, whether BB&T is entitled to damages in the form of late charges, appraisal fees, and attorneys' fees and costs as a result of defendants' default of the relevant agreements. (See 712 Joint Stip. ¶ 22; 713 Joint Stip. ¶ 22; see also Trial Tr. 3:12-20, 120:8-19, 123:17-22). Defendants do not dispute the principal and interest owed on the line of credit note and the term loan note. (712 Joint Stip. ¶ 20; 713 Joint Stip. ¶ 20).

Contract interpretation is a question of law, tasking the court to discern the parties' intent through the prism of the written agreement. Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped, 886 A.2d 706, 711 (Pa. Commw. Ct. 2005) (citing Robert F. Felte, Inc. v. White, 302 A.2d 347, 351 (Pa. 1973)). When contract language is ambiguous, or "subject to more than one reasonable interpretation when applied to a particular set of facts," parol evidence may be admitted to determine the intent of the parties. Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 430 (Pa. 2001). Absent ambiguity, the plain language of the agreement as written must be interpreted and enforced by the court. See id. at 429.

To determine whether ambiguity exists, courts consider the language of the contract itself, alternative meanings tendered by the parties, and the nature of any objective evidence offered in support of the proposed constructions. Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93 (3d Cir. 2001) (quoting Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)). Contractual ambiguity may take one of two forms: patent ambiguity is apparent on the surface of an agreement, whereas latent ambiguity "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." Id. Under Pennsylvania law, a litigant may establish latent ambiguity by either: (1) tendering external evidence that supports a reasonable alternative construction of specific contract language; or (2) demonstrating that a plain reading of the contract's written terms compels an absurd and unreasonable result. Id. at 96.

At trial, Richard Angino attempted to introduce parol evidence to support his position regarding late charges, appraisal fees, and attorneys' fees and costs. (See, e.g., Trial Tr. 103:23-104:4, 112:17-21, 114:2-25). The court finds no patent ambiguities in the relevant agreements, and defendants failed to introduce any evidence that establishes latent ambiguities. Accordingly, we look to the plain language of the relevant agreements. Murphy, 777 A.2d at 429.

The contractual language set forth *supra* expressly entitles BB&T to collect late charges, appraisal fees, and attorneys' fees and costs to enforce its rights pursuant to the relevant agreements. (See generally 712 J-A- to –H; 713 J-A to -H). Defendants concede that they are in default, yet Richard Angino testified that BB&T is seeking damages solely because he is a party to these lawsuits. (Compare 712 Joint Stip. ¶¶ 19, 21; 713 Joint Stip. ¶¶ 19, 21, with Trial Tr. 114:22-25). We find this contention to be meritless. BB&T is seeking reimbursement for costs incurred as a result of defendants' failure to pay pursuant to terms agreed upon by the parties. We find that BB&T is entitled to damages in the form of late charges, appraisal fees, and attorneys' fees and costs pursuant to the terms of the parties' contractual agreements. (See generally 712 J-A to –H; 713 J-A to -H).

A.     **Late Charges**

The evidence presented at trial shows that BB&T has incurred $6,274.91 in late charges related to the line of credit note, and $2,886.65 in late charges related to the term loan note. BB&T has proven by a preponderance of the evidence that defendants are liable for the late charges incurred by BB&T pursuant to the terms

of the line of credit note and any modifications thereto, the term loan note and any modifications thereto, and the surety agreements.

**B.    Appraisal Fees**

The evidence presented at trial further establishes that BB&T has incurred $14,000 in appraisal fees. BB&T has proven by a preponderance of the evidence that defendants are liable for these fees pursuant to the terms of the forbearance agreement.

**C.    Attorneys' Fees and Costs**

Finally, the evidence presented at trial shows that BB&T has incurred $163,865.30 in attorneys' fees and $5,431.94 in costs. BB&T has proven by a preponderance of the evidence that defendants are liable for attorneys' fees and costs incurred by BB&T pursuant to the terms of the line of credit note and any modifications thereto, the term loan note and any modifications thereto, the surety agreements, and the forbearance agreement. Accordingly, we must examine whether the attorneys' fees and costs claimed by BB&T are reasonable.

Contractual agreements that provide for "the shifting of attorney fees" in the event of breach are enforceable under Pennsylvania law. McMullen v. Kutz, 985 A.2d 769, 775 (Pa. 2009). However, we must make an independent determination of the reasonableness of the attorneys' fees and costs. Id. at 776. We use the lodestar formula for determining the reasonableness of a requested fee, multiplying the number of hours reasonably expended by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001). "When the applicant for a fee has carried his burden of showing that the

claimed rates and number of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled." Pennsylvania v. Del. Valley Citizens' Council, 478 U.S. 546, 564 (1986) (internal quotation marks omitted). The burden then shifts to the opposing party to demonstrate the unreasonableness of the hours and rate. Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990). The court cannot decrease the award based on factors not raised by the adverse party. Id. (internal quotation marks omitted).

      **1.**    ***Billing Rate***

The party seeking attorneys' fees must establish by satisfactory evidence the reasonableness of their claimed billing rate. Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 708 (3d Cir. 2005). This burden is normally addressed by affidavits prepared by the moving party's attorneys and other attorneys in the relevant legal community. Id.; Evans v. Port Auth. of N.Y & N.J., 273 F.3d 346, 360-61 (3d Cir. 2001). Once the moving party establishes their *prima facie* case, the burden shifts to the opposing party to submit rebuttal evidence to contest the reasonableness of the claimed rate. Evans, 273 F.3d at 361.

If the party seeking fees fails to meet their *prima facie* burden, the court has discretion to determine a reasonable billing rate. Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 180 (3d Cir. 2001). In calculating a reasonable billing rate, the starting point is the attorney's usual billing rate, but this rate is not dispositive. Pub. Interest Research Grp. of N.J., Inc. v. Windall, 51 F.3d 1179, 1185 (3d Cir. 1995). The court should also look to prevailing market rates in the relevant community. Blum v. Stenson, 465 U.S. 886, 895 & n.11 (1984); Rode, 892 F.2d at 1183. The relevant

community—absent certain exceptions that are not triggered here—is the "forum of the litigation." Interfaith Cmty. Org., 426 F.3d at 705. It is well established that parties are entitled to seek fees for paralegal services. Missouri v. Jenkins by Agyei, 491 U.S. 274, 285 (1989).

Defendants agree that the rates charged by plaintiffs' attorneys, paralegals, and support staff are reasonable. (See Trial Tr. 19:6-20). The court concurs with this assessment. A survey of recent fee awards confirms that hourly rates in the range of $300 to $364.50 for attorneys and hourly rates in the range of $150 to $240 for paralegals are reasonable in the Middle District of Pennsylvania. See, e.g., Clemens v. N.Y. Cent. Mut. Fire Ins. Co., 264 F. Supp. 3d 618, 662 (M.D. Pa. 2017) (Mannion, J.) (collecting cases); Borrell v. Bloomsburg Univ., 207 F. Supp. 3d 454, 510-11 (M.D. Pa. 2016) (Caputo, J.); Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp., No. 3:10-CV-1559, 2016 WL 1076910, at *5 (M.D. Pa. Mar. 18, 2016) (Mehalchick, M.J.); United States ex rel. Sharon McKinney v. DHS Techs., LLC, No. 3:11-CV-146, 2015 WL 11675668, at *6 (M.D. Pa. Oct. 27, 2015) (Carlson, M.J.), adopted by 2016 WL 4592175, at *6 (M.D. Pa. Feb. 4, 2016) (Mariani, J.); J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., No. 3:07-CV-585, 2014 WL 1321116, at *7 (M.D. Pa. Mar. 31, 2014) (Munley, J.). We further find that the Ham's hourly rate of $220 is reasonable in light of her considerable expertise on matters of electronic discovery.

## 2. *Reasonableness of Hours Expended*

The court must also determine whether BB&T's counsel has submitted evidence of the number of hours worked that is specific enough to allow the court to

determine their reasonableness.  <u>Washington v. Phila. Cty. Ct. of Common Pleas</u>, 89 F.3d 1031, 1037 (3d Cir. 1996); <u>Rode</u>, 892 F.2d at 1183.  The court must examine the record to assess whether the hours billed are reasonable for the work performed and must exclude those entries which are redundant, excessive, or unnecessary.  <u>Pub. Interest Research Grp. of N.J., Inc.</u>, 51 F.3d at 1188; <u>Rode</u>, 892 F.2d at 1183.

Once the moving party meets its initial burden, the opposing party may challenge the requested fee with sufficient specificity to put the moving party on notice.  <u>Rode</u>, 892 F.2d at 1183.  "General" or "conclusory" challenges do not meet the specificity requirement.  <u>Arlington Indus.</u>, 2016 WL 3522964, at *8 (citing <u>United States v. Eleven Vehicles, Their Equip. & Accessories</u>, 200 F.3d 203, 211-12 (3d Cir. 2000)).  The burden then shifts back to the moving party to justify the size of its request.  <u>Interfaith Cmty. Org.</u>, 426 F.3d at 711.  Upon objection from the opposing party, the court has "a positive and affirmative function in the fee fixing process, not merely a passive role."  <u>Loughner</u>, 260 F.3d at 178; <u>Maldonado</u>, 256 F.3d at 184.  A properly lodged objection tasks the court to "go line, by line, by line" through the billing records supporting the fee request.  <u>Evans</u>, 273 F.3d at 362.  However, a reviewing court can only consider those entries that the opposing party expressly identifies.  <u>See</u> <u>Arlington Indus.</u>, 2016 WL 3522964, at *8 (citing <u>Eleven Vehicles</u>, 200 F.3d 203 at 211-12).

We find that BB&T has submitted evidence of the number of hours worked that is specific enough to allow the court to determine their reasonableness.  (<u>See generally</u> P-K; <u>see also</u> Trial Tr. 11:1-14:5, 16:10-17).  We further find, after thorough review of the record, that the hours billed by McNees are reasonable for the work

performed.  (See P-K; see also Trial Tr. 17:1-13, 21:2-12, 28:1-11, 46:7-47:4).

Defendants object to the number of hours billed but offer only conclusory

challenges.  (See, e.g., Trial Tr. 20:17-25, 87:1-2, 101:10-14, 105:15-21).  Their general

objections do not meet the specificity requirement.  Arlington Indus., 2016 WL

3522964, at *8 (citing Eleven Vehicles, Their Equip. & Accessories, 200 F.3d at 211-

12).  We therefore find that BB&T is entitled to the full amount of attorneys' fees

requested.

### 3. *Costs*

Reasonable costs are those "incurred in order for the attorney to be able to

render his or her legal services."  Abrams v. Lightolier Inc., 50 F.3d 1204, 1225 (3d

Cir. 1995).  The court has discretion to decide which costs to award.  See Bowers v.

Foto-Wear, Inc., No. 03-1137, 2007 WL 4086339, at *4 (M.D. Pa. Nov. 15, 2007) (citing

Farmer v. Arabian Am. Oil Co., 379 U.S. 227, 232 (1964)).  The moving party bears

the burden of "adequately documenting and itemizing the costs requested."

Arlington Indus., 2016 WL 3522964, at *12 (internal quotation marks omitted).

BB&T's counsel seeks costs in the amount of $5,431.94.  Their request is

supported by a detailed narrative for each cost incurred.  (See P-K; see also Trial

Tr. 16:18-22).  The court finds that the costs requested are both reasonable and

adequately documented.  Accordingly, we will award costs in the amount of

$5,431.94 as requested.

## III.  **Conclusion**

For the aforementioned reasons, the court finds in favor of BB&T on its claim for breach of contract.  The court will award damages for principal and interest due on the line of credit note in the amount of $600,000 (principal) and $57,741 (interest) plus any interest that has accrued since June 15, 2018; principal and interest due on the term loan note in the amount of $9,174.41 (principal) and $4,274.46 (interest) plus any interest that has accrued since June 15, 2018; late charges in the amount of $9,161.56; appraisal fees in the amount of $14,000; and attorneys' fees and costs in the amount of $163,865.30 and $5,431.94, respectively. An appropriate order shall issue.

 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    September 17, 2018